George H. GALOVICH, Appellant,

v.

The HERTZ CORPORATION and General Motors Corporation, Respondents.

No. 57109.

Supreme Court of Missouri, Division No. 1.

Sept. 9, 1974.

**327**

C. Marshall Friedman, Gray, Friedman & Ritter, St. Louis, for plaintiff (appellant).

Evans & Dixon, William Wallace Evans, St. Louis, for respondent, The Hertz Corp.

Kortenhof & Ely, Joseph M. Kortenhof, St. Louis, for respondent General Motors Corp.

WELBORN, Commissioner.

Action for $185,000 damages for personal injuries arising out of automobile accident. Jury returned verdict for defendants. Plaintiff appealed.

Plaintiff, George H. Galovich, was employed as a truck driver by a St. Louis audio-visual equipment company. He drove a General Motors step van owned by Hertz Corporation and leased to his employer. Hertz was responsible for the maintenance of the truck.

At around 1:00 P.M., July 23, 1969, Galovich was driving the truck north on Lindbergh Boulevard in the vicinity of the Highway 70 interchange. As he approached the Long Road intersection, driving in the right-hand lane at from 20 to 25 miles per hour, he slowed because of traffic from Long Road. He applied his brakes, heard a thump, and the truck "dropped" to the right, went out of control and veered to the right. It crossed the right-hand shoulder and ran into a ditch. The truck struck a concrete culvert. Galovich was thrown into the windshield and injured. He remembered nothing which occurred after the truck veered to the right.

Galovich brought suit against General Motors, as manufacturer of the truck, and against Hertz as its lessor. The theory ultimately submitted of General Motors' liability was that the accident was caused by a defective king pin in the right front wheel assembly of the truck. The theory of Hertz's liability was that it furnished a truck with a defective right front wheel assembly of which it knew or which it might have discovered by ordinary care.

The right front wheel of the vehicle was displaced during the accident. When the truck came to rest in the ditch, the right front wheel was under the left front of the truck. The right wheel was attached to the truck only by the tie rod. Examination showed that the king pin in the right front wheel assembly was broken in two large pieces and one smaller pie-shaped segment which was not found. The hotly contested issue on the trial was whether, as plaintiff contended, the king pin broke, allowing the right front wheel to drop and causing the truck to swerve into the ditch, or whether, as defendants contended, the king pin was sheared when the right front wheel struck the concrete side of the culvert, near where the truck came to rest. The defense theory, further, was that the truck ran off the road when plaintiff suffered a momentary blackout.

An off-duty Berkeley policeman was stopped at the Lindbergh-Long Road intersection, just beyond the final resting place of the van in the ditch. He testified as a witness for plaintiff that he saw the van swerve to the right and that the tire of the right front wheel was "off the rim" before the vehicle hit the culvert. He testified that he saw the *wheel* off the truck before the truck started down the embankment along Lindbergh. On cross-examination, the witness acknowledged that he had given a statement to an interviewer on July 26, 1969, in which he stated that he could not tell whether the wheel came off before or after it hit the culvert.

328

Professor Erwin C. Hoelscher, an associate professor of mechanical engineering at Washington University, testified on behalf of plaintiff. He testified that his examination of the broken king pin led him to conclude that a fatigue fracture had occurred. According to him, the fracture was the result of the "pressure of an imperfection, a scratch or grinding mark or collection of material which is improper and does not have the ability to resist," occurring in the original design or manufacture of the part. He was of the opinion that the failure of the king pin caused the wheel to come off and the truck to turn to the right. He was further of the opinion that the fracture of the king pin was not the result of the right wheel striking the culvert. He stated that the history of the maintenance of the truck, which included numerous complaints of the vehicle pulling to the right, brakes grabbing and noise in the right wheel assembly, indicated excess stress upon the component parts of the right wheel assembly which accelerated the fatigue crack and ultimate fatigue failure.

Dr. Leonard Gulbransen, professor of physical metallurgy at Washington University, testified on behalf of plaintiff. He testified that his examination of the pieces of the broken king pin led to the conclusion that a fatigue fracture had occurred. He stated that in his opinion it was not an impact fracture.

The defendants offered expert testimony that the fracture of the king pin was an impact fracture which occurred when the wheel struck the culvert after the truck had gone into the ditch. They found no evidence of fatigue fracture.

Further facts will appear in the subsequent discussion of the grounds of error here urged.

Plaintiff called as a witness James A. Pflum, service manager for Hertz. Pflum stated that he saw the truck about an hour and a half after the accident. He looked at the separated wheel and noticed that the tire was inflated. He observed no dents in the rim of the wheel. He did notice a "bruise" on the tire. He stated that the wheel was kept by Hertz. It was examined at Hertz's garage by plaintiff's attorney and produced at the trial. At the trial, the rim of the wheel showed a dent. Pflum stated that he did not know who put the dent in the rim. The following occurred in the witness's direct examination:

"Q. This wheel had been examined by other people. Had other people come to see it?

"A. I believe so.

"Q. Who was the first person who came to see the wheel after you brought it back to Hertz? Can you tell me some of the people who had an opportunity to look or tamper with it?

"A. I could not tell you. Everyone was okayed by the lawyer.

"Q. By who?

"A. Everytime anybody looked at it, it was okayed by the lawyer.

"Q. That does not answer my question. Can you tell me who saw it?

"THE COURT: Would you both step up here a minute?

"(The following was had at the bench, out of the hearing of the jury.)

"THE COURT: I always see danger. The answer is going to be inflammatory. The man from the insurance company.

"MR. KORTENHOF: That is what Mr. Friedman is looking for.

"THE COURT: I am going to warn you about that.

"MR. KORTENHOF: That is what he is looking for and I would move for a mistrial.

"THE COURT: I won't say that. I know from being up here I recognize danger signals. I don't see what difference it makes who saw it."

No further question along this line was asked by plaintiff's counsel.

After plaintiff closed his case and before defendants offered any testimony, the following occurred outside the presence of the jury:

"MR. FRIEDMAN [counsel for plaintiff]: Your Honor, by reason of an expression of the Court in a rule of the Court, out of the hearing of the jury yet when questioning Mr. Pflum and concerning the possibility of Mr. Pflum testifying that the insurance agency may have seen the tire and when questioning Mr. Pflum about alterations in the rim, the Court expressed an opinion to me that I was proceeding on light ground and to keep away from the possibility of his mentioning the insurance company—

"THE COURT: That was at the bench on the record?

"MR. FRIEDMAN: Yes. It is my belief that two of the witnesses that will testify for the defendant, that being Mr. Deppe and Mr. Srenco, who obtained the photographs, they were both retained by the insurance company and were paid by the insurance company and I would desire to elicit this fact from both witnesses in order to show the interest of the witnesses in the outcome of the litigation and I would express my desire to do so now and ask whether the Court will permit me to get into this.

"MR. EVANS [counsel for Hertz]: He is going to inquire in that manner and I would object as being prejudicial. Mr. Deppe's report was addressed to Mr. Friedman and was not addressed to General Adjustment Bureau, which at that stage, in July, was directing the investigation. I can concede he is entitled to show the photographs were made at the request of General Adjustment Bureau and made his report out to them. The same is true of the photographer because he indicated he was called by General Adjustment Bureau.

"THE COURT: This does not present any difficulty to me.

"MR. EVANS: This is not an insurance company.

"THE COURT: He has stated he was employed by the General Adjustment Bureau and acting on behalf of the defendant but as far as an insurance company is concerned the answer is not insurance, should not be brought in in that manner and if it is improperly brought out I would rule mistrial. You can prove who employed the photographer but if in any case you show General Adjustment no. You can show he was acting for and on the behalf or employed by the defendant.

"MR. FRIEDMAN: I may not make mention of General Adjustment Insurance Company?

"THE COURT: No, I will declare a mistrial if that happens."

In response to an inquiry by plaintiff's counsel in connection with voir dire examination of jurors, it was revealed that the Royal Globe Insurance Group was the insurance carrier for both defendants. The basis of reference to "General Adjustment Insurance Company" is not clear.

Robert Srenco testified on behalf of Hertz. He identified a number of photographs which he had taken of the scene of the accident and of the truck on the Hertz lot after the accident. He stated that he was a professional photographer and that he was employed by John Steck from General Adjustment Bureau to take the photographs in this case.

Fred Deppe, a metallurgist employed by the St. Louis Testing Laboratory, testified as an expert on behalf of Hertz. He expressed the opinion that the king pin failed as a result of a "sudden impact." He testified that he made his report to General Adjustment Bureau.

On this appeal, appellant contends that the trial court erred in refusing to permit

plaintiff's counsel to develop the relationship between these three witnesses and the Royal Insurance Group. Appellant contends that the relationship involved questions relating to the weight to be given by the jury to the testimony of the witnesses and their credibility.

■ Although the injection of insurance in personal injury litigation is a somewhat touchy matter, the trial court's insistence that any mention of an insurance company would be grounds for a mistrial was too broad. As the cases cited and relied upon by appellant hold, there are instances in which the relationship between an insurance company and a witness is a proper subject of inquiry. In Grindstaff v. J. Goldberg & Sons Structural Steel Co., 328 Mo. 72, 40 S.W.2d 702, 706[12] (1931), this court said:

■ "* * * [I]f an insurance company is the real defendant and as such is resisting plaintiff's action and conducting a defense of its own contriving, it should be compelled to put aside its disguise and stand in the open. Both the court and the jury have a right to know who are the real parties litigant; questions relating to the admissibility of evidence, the weight to be given testimony, and the credibility of witnesses are involved. Snyder v. Wagner Elec. Mfg. Co., 284 Mo. 285, 223 S.W. 911; Jablonowski v. Modern Cap. Mfg. Co., 312 Mo. 173, 279 S.W. 89; Schuler v. Can Co., 322 Mo. 765, 18 S.W.(2d) 42."

See also Leavitt v. St. Louis Public Service Company, 340 S.W.2d 131, 137–139[9], [10] (Mo.App.1960); Turner v. Caldwell, 349 S.W.2d 493, 498–499[4, 5] (Mo.App.1961); Wren v. St Louis Public Service Company, 355 S.W.2d 365, 368[1] (Mo.App.1962).

The difficulty with appellant's contention here is that there is no showing that had the trial court permitted the questioning he says he would like to have done that the witnesses would have responded with answers establishing the relationship which

appellant may have been entitled to show. There was no indication from appellant's counsel that Pflum would state that insurance company representatives had examined the tire. Even if he had, such evidence would not impeach Pflum's testimony. Pflum stated that he could not state who had seen the tire. He did state that everyone had been "okayed" by the lawyer, but there is no basis for the assumption, although the trial court engaged in it, that the witness, if pressed, would state that insurance company representatives saw it.

The same is true of the witnesses Srenco and Deppe. The former was a self-employed photographer, engaged by General Adjustment. The latter was an employee of a testing firm, likewise engaged by General Adjustment. In his colloquy with the court, appellant's counsel stated only that he "believed" that both witnesses would say they were "retained" by the insurance company and paid by the insurance company. The evidence was that both were employed by General Adjustment for the particular job. There is no indication that either was knowledgeable of the connection, if any, between General Adjustment and the insurer.

■ Absent some showing that these witnesses could properly testify to the relationship which appellant believed to exist, the ruling of the trial court cannot be grounds for reversible error. Morton v. Heidorn, 135 Mo. 608, 37 S.W. 504, 505 3. (1896); State ex rel. State Highway Commission of Missouri v. Vesper, 419 S.W.2d 469, 472[4, 5] (Mo.App.1967); 5A C.J.S. Appeal and Error, § 1716, p. 894.

Appellant's second assignment of error relates to the exclusion of a statement of appellant's witness Hurt, the off-duty police officer who testified as an eye-witness. As above related, on direct examination, the witness testified that he saw the right wheel off the truck before it struck the culvert. On cross-examination, a written statement, dated July 26, 1969, was produced in which the witness stated that he

did not know whether the wheel was off before the truck hit the culvert. The witness did not deny the accuracy of the statement.

On redirect examination, plaintiff's Exhibit No. 4 was marked. This exhibit purported to be a statement signed by the witness, and was dated July 25, 1969, at 5:10 P.M. The witness was asked to read the statement and the following occurred:

"MR. FRIEDMAN: Did you have a chance to read it, Officer?

"WITNESS: Yes.

"Q. Is that consistent with what you have originally testified to?

"A. Yes.

"MR. KORTENHOF: I object to that.

"THE COURT: Sustained.

"MR. FRIEDMAN: Officer, in that statement do—

"MR. KORTENHOF: I ask that the jury be instructed to disregard that last question and answer.

"THE COURT: All right. The jury will disregard the last question and answer.

"MR. FRIEDMAN: Without resorting to any statement or what someone else may have written and handed you to sign, now, can you recall and can you testify here today as to whether that wheel was off the truck before it hit the culvert? We are talking about the culvert, not the ditch.

"WITNESS: I referred back to my report and that is how I refreshed my memory on the thing.

"Q. Does that refresh your memory?

"A. Yes.

"Q. Was the wheel off?

"A. As far as my statement, yes.

"Q. The wheel was off when it struck the culvert, not the ditch?

"A. As far as my statement says, yes.

"Q. This was taken less than forty-eight or fifty hours after the collision occurred?

"A. Yes.

"Q. Thank you."

At the close of plaintiff's case, plaintiff's counsel asked that all exhibits which had been marked on behalf of plaintiff be entered into evidence. Counsel for General Motors stated: "There is the problem about the statement. I had a statement marked and Mr. Friedman had a statement marked. I don't know what the court's ruling on that is." The court then admitted all exhibits, except the statement.

In this court, appellant's second point is:

"The trial court committed prejudicial error in refusing to admit into evidence the prior consistent written statement of Charles A. Hurt, Jr., following his impeachment by defense counsel on cross-examination. Plaintiff was entitled to rehabilitate the impeached witness with the use of the prior consistent statement."

■ Missouri does permit the introduction of prior consistent statements in order to rehabilitate a witness who has been impeached by another prior statement, inconsistent with his trial testimony. Such rehabilitating statement is admissible even if the witness admits having made the statement used to impeach. Nielsen v. Dierking, 418 S.W.2d 146, 149[1] (Mo.1967); Stafford v. Lyon, 413 S.W.2d 495, 498[4, 5] (Mo.1967). The statement which plaintiff produced bore a prior date to that produced by defendant and contained a statement that Hurt "noted this vehicle on Lindbergh make a sudden right turn off the pavement and noted the right front tire and wheel assembly rolling alongside of this vehicle—thereafter the vehicle hit or went over a culvert * * *." Properly proffered, this statement would have been admissible under the rule relied upon by appellant.

The difficulty with appellant's present claim of error on the part of the trial court is that it is not the ground of error stated on this matter by his motion for new trial. The ground there stated was:

"The Court erred in refusing to permit plaintiff to fully examine Detective Hurt with the prior consistent statement signed by Detective Hurt (Plf's. Ex. 4) following the impeachment of Detective Hurt by the defendant with the defendant's later statement (Deft's. Ex. A). Detective Hurt testified in direct examination that he observed the right front wheel disengaged before the truck hit the culvert. Defendant produced a lengthy statement signed by Detective Hurt and dated July 26th, 1969, which defendant used to impeach the witness. Thereafter the plaintiff attempted to examine Detective Hurt with a prior consistent statement dated July 25th, 1969, and the Court erroneously refused to permit complete examination with the prior consistent statement."

It is clear that this objection was not directed at the trial court's ruling on the offer of the statement in evidence, the ground of error now urged, but was related to the trial court's rulings on objections to the attempt to examine the witness by way of the statement.

■ This court reviews claims of error which have been presented to the trial court by way of a motion for new trial. Rule 79.03, V.A.M.R. The claim of error here advanced is not that found in the motion for new trial and, therefore, will not be considered. Jackson v. Haley, 432 S. W.2d 281, 283[2] (Mo.1968); Handshy v. Nolte Petroleum Company, 421 S.W.2d 198, 202[9, 10] (Mo.1967); Lott v. Kjar, 378 S.W.2d 480, 485[4] (Mo.1964).

Appellant's third assignment of error is based on the trial court's ruling on an offer of testimony of an investigating police officer to a statement of plaintiff at the scene of the accident.

Officer Reeder of the Bridgeton Police Department investigated the accident in his official capacity. He found plaintiff sitting near the truck when he arrived and talked to him. On his redirect examination, plaintiff's counsel stated:

"Q. Officer, you testified you talked to Mr. Galovich there before he was taken to the, away from the scene?

"A. Correct.

"Q. Did he make a statement to you as speaking of any difficulty with the truck?

"A. Yes, he did."

Upon objection by counsel for defendant, plaintiff's counsel, outside the hearing of the jury, said:

"MR. FRIEDMAN: Your Honor, the defendants have made the statement in their opening statements that they will intend to prove that Mr. Galovich suffered blackouts and lost control of the truck. The statement and interview by the Officer at the scene, taken immediately after, indicated that Mr. Galovich told the Officer he had trouble with his tires and the truck went out of control. The medical evidence will show the seizures he was having, he is having since this occurrence. He has no remembrance, no recollection of the events immediately after the occurrence. And I believe this is competent evidence as to whether this man said this immediately after the occurrence. It was spontaneous, which will clearly show he did not have a blackout because he knew what happened and he was aware of what happened before he went off the road.

"MR. EVANS: Number one, he did not say, on behalf of Defendant Hertz, one way or the other whether the blackouts caused the accident.

"2) There is no question here it is anything but hearsay and relation of past events and self serving.

"MR. KORTENHOF: I will object. It is self serving.

"THE COURT: The Court does not believe any foundation has been laid for a res gestae statement. Objection sustained. "(The following was had within the hearing and presence of the jury.)

"MR. FRIEDMAN: Your Honor, at this time I would request that the Officer be excused."

In this court, appellant urges:

"The ruling of the trial court in sustaining defendants' objection to the res gestae statement of plaintiff at the scene of the collision constituted an abuse of discretion. The nature, manner and circumstances were such as to establish that the statement was so responsive to the mental impact of the collision as to render it admissible."

■ The trial court's determination was merely that the circumstances required for a res gestae statement had not been shown and appellant made no further effort to supply the evidence necessary to show the circumstances under which the statement was made. Appellant had not shown the spontaneity which is essential to establish a res gestae statement. The fact that the statement was made at the scene is insufficient. Sander v. Callahan, 351 S.W.2d 691, 695[3, 4] (Mo.1961); Wren v. St. Louis Public Service Company, 333 S.W.2d 92, 95[2], [3, 4] (Mo.1960); Brautigam v. Hoffman, 444 S.W.2d 528, 532[4–6] (Mo. App.1969). The only preliminary inquiry connected with the question about the plaintiff's statement was whether or not the officer talked to plaintiff before the ambulance removed him. Absence of other testimony pertinent to the circumstances of the conversation with the officer precludes any finding of error on the part of the trial court.

In the case of Bennette v. Hader, 337 Mo. 977, 87 S.W.2d 413 (1935), cited and relied upon by appellant, the evidence clearly showed the circumstances under which the statement was made so that its spontaneity was determinable. Here the circumstances were not so shown, and the trial court properly concluded that appellant did not meet his burden of bringing the statement within the res gestae exception to the hearsay rule. Wren v. St. Louis Public Service Company, supra.

■ Appellant's next point involves objection to deposition testimony of a physician, offered by defendant General Motors.

In April, 1969, plaintiff had bumped his head. For five or six weeks thereafter, he experienced dizzy spells. Near the end of May, 1969, plaintiff was driving an automobile with his wife as a passenger. Plaintiff felt weak and dizzy and because his auto was approaching too closely to a vehicle in front of him, plaintiff's wife, at plaintiff's request according to plaintiff, applied the brakes to plaintiff's auto. In June, 1969, plaintiff was admitted to DePaul Hospital in St. Louis. The admission note stated: "Thirty year old white married male, with episode of reduced consciousness, drove too close behind a truck, wife had to step on brakes. Patient does not recall this episode." Dr. E. Robert Schultz, a neurologist and psychiatrist, was called in as a consultant by plaintiff's admitting physicians, Doctor Webb and Doctor Lattenville. He saw plaintiff twice. Plaintiff was discharged after about a week's hospitalization, with no specific diagnosis having been made and no treatment instituted.

Plaintiff testified that, following his discharge from the hospital, he experienced no further dizziness prior to the July 23 accident.

On September 2, 1969, plaintiff again consulted Doctor Schultz and was hospitalized. At that time Doctor Schultz concluded that plaintiff was suffering from temporal lobe seizures.

Plaintiff testified that, following the July 23 accident, he had started developing a seizure condition involving blackouts. His medical witness testified that, in his

opinion, the injuries plaintiff sustained in the July 23 collision either caused the seizures or severely aggravated a preexisting condition. In his deposition, Doctor Schultz expressed the opinion that the accident injury had nothing to do with the plaintiff's temporal lobe seizures.

With this background, plaintiff's specific objections to portions of Doctor Schultz's deposition will be examined.

There was evidence that plaintiff had sustained injuries in an automobile accident on November 29, 1969, involving an automobile in which he was a passenger. Doctor Schultz was asked:

"Did he have any complaints of dizziness or blackouts following that accident of November 29, 1969?"

The reply was:

"He has continued to have blackouts ever since I have first seen him on June 7, intermittently * * *."

Appellant argues that, because Doctor Schultz did not see plaintiff between June 7, 1969 and September 2, 1969, "there was absolutely no basis for the admission of the above unfounded and speculative hearsay statement * * *." The question was not limited to that period. Doctor Schultz had seen plaintiff since September 2, 1969, and the statement was based on the medical history which he received from plaintiff. The objection is without merit.

■ The second objection relates to the following testimony:

"Q. He has remained under your care since then, has he not?

"A. Yes, and probably in spite of me he has.

"Q. Can you explain that?

"A. Well, I like George, and I really thought, well, I could see, if you read my notes, the legal problems were getting astronomical, with accident after accident, and I thought I was going to be the world's worse witness for George, because I had seen him in June, and I had sent him back to Doctor Lattenville, and Doctor Lattenville thought he needed psychiatric treatment, * * *."

Appellant contends that, since Doctor Lattenville's records were not introduced in evidence, the statement about Doctor Lattenville's opinion was hearsay.

Conceding that this testimony might have been hearsay, its admission cannot amount to reversible error. Considered in context, it is obvious that Doctor Schultz was referring to plaintiff's condition in June, 1970, not June, 1969. Plaintiff's medical evidence came from Doctor Bergmann, a neurologist and psychiatrist, who first saw plaintiff in July, 1970. His testimony was that he observed plaintiff from both a neurological and psychiatric standpoint. He testified that plaintiff had become somewhat paranoid and had emotional problems. Thus plaintiff's own evidence showed that he had psychiatric attention and Doctor Lattenville's opinion in that regard could not have been prejudicial.

■ Doctor Schultz's deposition was taken on behalf of General Motors and offered in evidence by that defendant. Counsel for plaintiff attended the deposition and cross-examined the witness. In the course of such examination, the following questions were asked by plaintiff's counsel and answered by Doctor Schultz:

"Q. What accidents did you blame on the blackouts?

"A. Well, I thought the one where he hit the sign; I don't have the date on that, except that it occurred on the Friday before September 2, whatever date that was, where he just blacked out and hit a sign. That's what he said happened.

"Q. Any others?

"A. No, except that I really was suspicious of the 23rd of July.

"Q. What were you suspicious about, Doctor?

"A. After hearing about the episodes that had occurred, prior to the June 7 admission, it seemed like that this was a carbon copy, except no accident happened, but it seemed like this man was quite prone to having blackouts. That's not for me to decide, but that was my impression."

Appellant objected to the reading of the portions of the interrogation relative to the witness's "suspicions" on the grounds that the doctor's answer was speculative, improper and invaded the province of the jury. The objection was overruled.

In this court, appellant argues that the "suspicions" of the witness were not properly admissible in evidence.

The line of questioning pursued by plaintiff's counsel sought the witness's opinion as a neurologist and psychiatrist as to which of plaintiff's accidents related to the blackouts. In using the expression that he was "suspicious," the witness, as demonstrated by his answer to the subsequent question, was expressing his opinion, based upon his knowledge as a physician, on the question propounded. In such circumstances, the fact that he expressed his conclusion in terms of a "suspicion" does not render the answer inadmissible. In the case of Armstrong v. Croy, 176 S.W.2d 852, 853–854 [1–3] (Mo.App.1944), cited by appellant, the court stated:

▉ "When a witness testifies, 'If I am not mistaken', 'probably', 'very likely' or 'possibly'; that he 'believes' or 'thinks' so and so to be the case, his testimony is objectionable and should be rejected. It is of no probative force or evidential value and definitely so if the witness is not testifying as an expert; and upon appeal such testimony should be considered, if at all, with great caution, although received without objection in the trial court. *Even when such expressions or words are used by a witness qualified to express an opinion his testimony will be rejected unless it sufficiently appears that such terms are used to express his opinion or judgment.* Hunter v. Helsley, 98 Mo.App. 616, 73 S.

W. 719; Willis v. K. C. Terminal Ry. Co., Mo.App., 199 S.W. 736, loc. cit. 740." [emphasis supplied]

▉ Plaintiff propounded an interrogatory to General Motors, asking whether General Motors or anyone at its request inspected any of the parts of the truck. It asked the name of anyone who did so, the date of his inspection and the part or parts inspected. General Motors replied that Robert A. Bailey, a General Motors employee, had inspected certain parts the weeks of October 11 and 18, 1970.

The last witness called on the fourth day of the trial was General Motors witness Robert J. Smith, a mechanical engineer employed by General Motors. He testified to his educational background and to the job he had held with General Motors. He testified that since 1965 he had worked in a "failure analysis group," with part of his job being evaluation of parts to determine if a part failed before an accident or as the result of an accident. He described the steering mechanism of a truck such as the vehicle involved, demonstrating his testimony by means of parts. He was asked whether he saw and examined the parts involved in this case, including the king pin, the steering knuckle and the linkage. He stated that he had done so at Detroit or Pontiac. He testified to what his examination disclosed with respect to the steering knuckle. He expressed the opinion that the distortion of the steering knuckle led him to conclude that the king pin broke as a result of the accident. At the conclusion of testimony that fills 20 pages of the transcript here, the court recessed until the next day.

When the court reconvened the next day, counsel for plaintiff objected to the witness's testifying because his name had not been given in response to the interrogatory above referred to. The trial court overruled the objection on the grounds that it was untimely.

Following the overruling of the objection, the witness testified that his examina-

tion of the Pitman gear disclosed a twisting of that part, possible only if the wheel was attached to the vehicle when the force was applied which caused the twisting. He testified that he had inspected the wheel and tire and concluded that the damage to the wheel had resulted from a load transmitted through the tire.

On this appeal, appellant, relying on Laws v. City of Wellston, 435 S.W.2d 370 (Mo.1968), contends that the trial court in basing its ruling on the untimeliness of the objection, failed to determine the prejudicial effect of the failure to disclose the identity of the witness, the prejudicial effect of his testimony, and did not exercise its discretion.

The Laws case was concerned primarily with the continuing nature of the obligation to answer interrogatories. In imposing upon a party the obligation to furnish information of a substantial nature which renders prior answers to interrogatories untruthful, unreliable or incomplete, the court said (435 S.W.2d 375):

"Necessarily, a trial court first will determine whether in the particular situation the opposing party has been prejudiced. The court might find in some instances, as did the Supreme Court of Arkansas in King v. Cardin, [229 Ark. 929, 319 S.W.2d 214] supra, that no prejudice resulted; but in cases where a party is surprised and prejudice could have resulted, the court will have to determine, in its discretion, whether to exclude the evidence, or to continue the case, or whether under some circumstances it would be sufficient to recess the case long enough to permit the complaining party to make necessary inquiry and investigation. In those instances, this court, on appeal, would have to consider any claim of abuse of such discretion, but that question is not presented to us here because the trial court did not proceed on the theory that there was any continuing obligation under Rule 56.01. Consequently, it did not exercise its discretion as to sanctions to apply for breach of such duty."

Here, the preliminary interrogation of the witness made it clear that he would testify as an expert mechanical engineer. Plaintiff had already presented the testimony of an expert mechanical engineer, so his counsel should not have been surprised that the defense would offer testimony to counter the testimony of plaintiff's witness. Evidently plaintiff's counsel was not surprised because, without objection, the witness was permitted to express an opinion on the ultimate controverted issue in the case, when the king pin fractured. Not until the next morning did counsel for plaintiff raise an objection.

In these circumstances the trial court is not to be convicted of error in basing its ruling on the timeliness of the objection. The rule laid down in Laws does not relieve the party objecting of his obligation to make his objection in a timely manner. In Cheffer v. Eagle Discount Stamp Co., 348 Mo. 1023, 156 S.W.2d 591, 594 (1941), the court stated:

"It has been consistently ruled that a party waives an objection if he does not make it timely. In 64 C.J. 173 we read: 'For reasons which are perfectly obvious, an objection to the introduction of testimony must be made in apt time, at the earliest possible opportunity after the objection becomes apparent, or it will be held to have been waived.' See also State v. Matkins, 326 Mo. 1072, 34 S.W.2d 1, loc. cit. 5(8); Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S.W.2d 742, loc. cit. 747 (8, 9)."

See also Banks v. St. Louis Public Service Co., 249 S.W.2d 481, 485[5] (Mo. App.1952); Dyer v. Globe-Democrat Publishing Co., 378 S.W.2d 570, 583[14] (Mo. 1964); Cargill v. Armocido, 476 S.W.2d 506 (Mo.1972). Objection to the competency of a witness must be made at the first opportunity and failure to do so precludes further objection on that score. Upshaw v. Latham, 486 S.W.2d 656, 659 [6, 7] (Mo.App.1972).

The ruling by the trial court of the objection here on the basis of its untimeliness was not erroneous.

Appellant also objected in the trial court that answer to his interrogatory relating to inspection of the scene of the collision did not reveal that Smith had done so. He repeats that argument here. However, he has not included the interrogatory upon which he relies in the transcript on appeal and there is, therefore, no basis for this court to pass upon the contention. (One respondent's brief sets forth what respondent says was the interrogatory involved. If that is correct, the interrogatory did not extend to Smith's inspection of the scene three days before his testimony.)

■ The final point on this appeal relates to the trial court's ruling on plaintiff's counsel's closing argument. Photographic evidence showed damage to the concrete culvert where the truck came to rest. The defendants' contention was that the damage was caused when the right wheel struck the culvert, fracturing the king pin and knocking the wheel off. Plaintiff's contention was that the damage to the culvert was caused when the left wheel struck the damaged area and plaintiff's counsel so argued to the jury. He then turned to the testimony of General Motors witness Smith in which the witness explained his opinion of how the right front wheel caused the damage and sought to refute the witness's theory. Smith had testified that "the culvert produced a force that compressed the wheel like so on the outer edge. That's what hit first." Appellant argued that the witness's testimony was as follows:

" * * * He also told you when I examined him, the force would have had to come from the outside of the tire in, in order to bend the rim. Their witness, Mr. Smith.

"MR. KORTENHOF: He thought it was the inside. I object.

"MR. FRIEDMAN: You remember; he said from the outside; the force had to come from the outside. You will remember to bend it on the inside rim the force had to come from the outside.

"MR. KORTENHOF: I object. It is outside of the scope of the evidence and not the testimony of Mr. Smith.

"THE COURT: Objection sustained."

Because Smith's testimony was partly by way of demonstration, not reproducible by the transcript on this appeal, the details of some of his testimony are not clear. However, considered as a whole, his testimony taken from the transcript is susceptible to the construction that his reference to the "outer" portion of the wheel was to the outer circumference of the tire, not to its right outside surface as plaintiff's counsel was arguing. Smith did testify that the wheel was in a right turn position when it hit the culvert and that the damage was to the "inside" of the wheel.

In view of the inability of the transcript to include the witness's demonstration, the trial court is not to be convicted of error on the grounds here urged. Having both heard and observed the witness, the trial court was in a better position to understand the witness's testimony than this court viewing only the cold record. Furthermore, as plaintiff's argument following the sustaining the objection shows, the fact that the objection was sustained had little inhibiting effect on plaintiff's counsel's argument. After the objection had been sustained, the argument was continued as follows:

"MR. FRIEDMAN: You will remember the evidence. You are the only judges of the evidence in the case. You. The jury. No one is higher than you in determining the facts of how this case occurred and you will remember when you go up to the jury room to deliberate.

"With such a force, how would this wheel have bent with the force coming in

this direction? It would have to have been inside. The bottom would have had to come in like this. And how did they say the knuckle was bent? They said the wheel had to come out the way the knuckle was bent, in order for this to have occurred. We have the picture of the culvert. Here it is. Defendant's Exhibit E. That is the culvert and here is the highway back here. And we see there is damage done to the culvert on this downward slope, right here."

Under all of the circumstances, no basis for finding of error on the part of the trial court has been shown.

Judgment affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court. BARDGETT, P. J., SEILER, J., and DONNELLY, C. J., concur.

HOLMAN, J., not sitting.