**Ruben M. CONCHOLA, By and Through his mother and next friend, Mrs. Connie Conchola, Respondent,**

**v.**

**Donald E. KRAFT and Churchill Truck Lines, Inc., Appellants.**

**No. KCD 29540.**

Missouri Court of Appeals, Kansas City District.

Nov. 27, 1978.

Rehearing Denied Dec. 27, 1978.

William H. Sanders, Thomas W. Wagstaff, Charles A. Schliebs, Kansas City, for appellants.

Anthony J. Romano, Louis J. Sill, Jr., Kansas City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

TURNAGE, Judge.

Ruben Conchola, age 14, brought suit by his mother as next friend against Donald Kraft and Churchill Truck Lines for personal injuries. The jury returned a verdict in favor of Ruben for $20,000 and his mother for $2,000. On this appeal Kraft and Churchill allege the following errors: (1) allowing an amendment to the petition on the day of trial; (2) permitting a physician to testify whose name had not been revealed through supplementation of interrogatory response; and (3) the verdict was excessive. Affirmed.

Kraft and Churchill do not raise any question concerning the finding of negligence on their part. Briefly stated, Ruben was a passenger on a motorcycle when a Churchill single-axle trailer unit driven by Kraft ran a stop sign and pulled out in front of the motorcycle. Ruben's cousin, the operator of the motorcycle, was forced to stop suddenly to avoid striking the trailer unit and the cycle overturned on top of the two boys. Reference to Ruben's injuries will be made in discussion of the third point.

In their first point Kraft and Churchill contend the court erred in allowing Ruben to amend his petition for damages on the morning of trial. The allegation in the motion for a new trial complained of the court granting leave to amend the prayer of the petition by increasing the amount of damages sought from $2,500 to $125,000. However, in their brief Kraft and Churchill urge error in allowing the petition to be amended to include an allegation that Ruben would be required to undergo surgery. The ad damnum amendment is mentioned only in regard to the amendment concerning surgery and the en-

tire argument is directed at the unfairness of an amendment which for the first time alleged the necessity of surgery. Such an amendment may not be noticed on this appeal because it was not presented to the trial court in the motion for a new trial. Rule 78.07; *Cato v. Modglin*, 545 S.W.2d 307 (Mo.App.1976).

At any rate the propriety of granting leave to amend a petition is wholly discretionary with the trial judge and may not be questioned on appeal absent a clear abuse of discretion. *Kallenbach v. Varner*, 502 S.W.2d 446, 448[2–4] (Mo.App.1973). This likewise applies to an amendment of the prayer for damages. 71 C.J.S. Pleading, § 293, p. 666. No effort has been made to demonstrate an abuse of discretion with reference to the damages amendment and none is discerned.

The accident occurred September 25, 1974, and Kraft and Churchill propounded interrogatories in August, 1975. About a month after answering the interrogatories, Ruben for the first time consulted Dr. Gordon Thorn, who made four reports concerning Ruben's condition between his first examination and the trial. Ruben's counsel did not supplement the answers to interrogatories to include Dr. Thorn's name as a physician consulted with reference to his injuries. Dr. Thorn testified that there is a reasonable medical probability Ruben will have to undergo a spinal fusion. There was no objection made when Dr. Thorn was called as a witness. In fact, the direct examination of Dr. Thorn covers about 32 pages of the transcript and the cross-examination 21 pages. During all that time no objection was made. The first objection to Dr. Thorn appearing as a witness was made in the motion for a new trial when it was alleged the court erred in allowing the doctor to testify because his name had not been revealed to Kraft and Churchill through supplemental answers to interrogatories. Kraft and Churchill now argue that their objection to the amendment of the petition, alleging for the first time the necessity of an operation, was sufficient to raise an objection to Dr. Thorn's appearance as a witness.

The record does not show an objection to the amendment of the petition because this was made at an in-chambers conference and the reporter's notes on this conference were lost. However, assuming an objection was made to the amendment, it is apparent this would not suffice as an objection to the appearance of Dr. Thorn. The amendment of the petition went only to the issues to be tried and not to the witnesses who would prove those issues. It is conceded that no objection was ever made to the trial court concerning the appearance of Dr. Thorn. Thus, any objection to the appearance of Dr. Thorn was waived. *Galovich v. Hertz Corp.*, 513 S.W.2d 325, 336 (Mo.1974). In *Galovich* the court held an objection was waived to the appearance of a witness whose name had not been furnished either by interrogatory answer or by supplemental answer because the objection was made after the witness had testified on direct examination. Here no objection was ever made to the appearance of Dr. Thorn, the first mention appearing in the motion for a new trial. Under the holding in *Galovich*, any objection Kraft and Churchill had to the appearance of Dr. Thorn was waived.

Kraft and Churchill also contend the verdict was excessive because the jury erred in weighing the evidence as to the nature and extent of injuries. This requires a review of the evidence concerning Ruben's injuries. Immediately after the accident Ruben was taken to the Bethany Medical Center emergency room where he was examined, x-rayed and released. About 23 days later, Ruben saw Dr. Moreano who referred him to Dr. Gottsch. Dr. Gottsch examined Ruben and made a diagnosis of probable soft tissue strain to the dorsal and lumbar spine, probable soft tissue sprain and contusion to the right hip, and probable soft tissue strain and contusion of the right thumb.

Ruben first saw Dr. Thorn in October, 1975. On his first examination, Dr. Thorn found Ruben to have a 10–15 percent limitation of bending from side to side and positive straight leg raising to 80 degrees. He also found a pre-existing spondylolysis

of the fifth pars interarticularis which was asymptomatic prior to the accident. Dr. Thorn made a diagnosis of lumbosacral instability with chronic lumbosacral strain and that the injury of September, 1974, had aggravated the pre-existing back condition. Dr. Thorn indicated Ruben would be unable to participate in sports or to do any lifting or bending required in a labor-type job. In Dr. Thorn's second report in January, 1976, he suggested Ruben obtain a lumbosacral support to determine if it offered any relief. In his third report, in March, 1976, Dr. Thorn stated the back brace seemed to offer some relief but he still believed Ruben suffered from lumbosacral instability due to the soft tissue back injury received in the accident. He stated Ruben's prognosis was guarded and spinal fusion surgery would probably be required. In his last report in August, 1976, Dr. Thorn noted Ruben continued to have pain when he exerted himself by bending, stooping and lifting. He recommended Ruben continue using the brace and again noted the possible necessity of a spinal fusion. After examining Ruben the day prior to the commencement of trial, Dr. Thorn testified that within a reasonable medical probability, Ruben would require spinal fusion surgery.

Ruben testified he had lower back pains following the accident and that he had had no pain prior to this injury. Ruben also stated he had been active, participating in sports such as weight lifting, football and basketball and performing chores around the house, but since the accident he was unable to compete in any sports. He further stated he had formerly played the drums in a band but was now unable to do so because of the injury and he had to take pain pills and nerve pills because of the pain in his hip.

There was evidence that the cost of a spinal fusion would total approximately $2,450 and require a rehabilitation period of six months to a year. The medical expenses incurred to the date of trial totaled $516.43 and Ruben's mother testified she had also purchased drugs amounting to about $300.

In reviewing the injuries under an allegation that the verdict is excessive, this court is required to view the evidence in the light most favorable to the plaintiff. *Blond v. Overesch*, 527 S.W.2d 663, 672 (Mo.App. 1975). The factors to be considered in determining whether or not a verdict is excessive are fully set out in *Woodford v. Illinois Central Gulf Railroad Company*, 518 S.W.2d 712, 718[13–17] (Mo.App.1974) and, as this court observed in *Blond*, the law rightly vests broad discretion in the jury to fix the amount of an award. A further factor to be considered is the refusal of the experienced trial judge to order a remittitur. *Ricketts v. Kansas City Stock Yards of Maine*, 537 S.W.2d 613, 621 (Mo.App.1976).

Finally, this court must consider what amount would constitute fair and reasonable compensation for Ruben's injuries within a uniform limit for compensation for comparable injuries and in view of the growth of inflation. *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417, 423[12–14] (Mo. banc 1973).

Viewing the evidence of Ruben's injuries in the light most favorable to him and bearing in mind the refusal of the trial judge to order remittitur, this court cannot hold as a matter of law that the verdict is excessive. With reference to uniformity in verdicts, this court notes *Rhodenberg v. Nickels*, 357 S.W.2d 551 (Mo.App.1962) in which a verdict of $14,070 was approved, without any evidence as to the necessity of a spinal fusion, for back injuries sustained by a sixteen year old boy. Considering the rate of inflation since 1962, this court cannot say the verdict in the present case is not uniform with the amount approved in *Rhodenberg*.

The judgment is affirmed.

All concur.